UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ERIC PIGFORD,  :  Hon. Joseph H. Rodriguez

    Plaintiff,  :  Civil Action No. 14-2818

v.  :  OPINION

RAPISCAN SYSTEMS, INC.  :

    Defendant.  :

This matter is before the Court on Defendant's motion for summary judgment on Plaintiff's One-Count Complaint alleging racial discrimination by Defendant, his former employer. The Court has reviewed the submissions and decides the matter based on the briefs pursuant to Fed. R. Civ. P. 78(b). For the reasons stated here, Defendant's motion will be granted.

## Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the

1

showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party

must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

## Factual Background

Defendant Rapiscan Systems, Inc. develops, manufactures, sells and services security screening and threat detection solutions, including X-ray machines and metal detectors, for aviation, critical infrastructure, customs and border protection, defense, event security, ports and law enforcement markets. (Ohnegan Cert., Ex. A, Pl. Dep. 18:25-19:19.)

Plaintiff Eric Pigford began working as Rapiscan's Director of Sales

North America on January 18, 2010. (Ohnegan Cert., Ex. A, 13:4-14.) Peter Kant, the Vice President of Sales, Americas, hired Plaintiff and supervised him throughout the entire term of Plaintiff's employment with Rapiscan. (Ohnegan Cert., Ex. A, 11:15-12:4; 13:17-24.) Plaintiff was hired to manage a team of sales managers and was responsible for the sales of Rapiscan's products in the commercial markets in North America, including state and local governments, the Canadian federal government and the United States Federal Bureau of Prisons. (Ohnegan Cert., Ex. A, 20:22-21:17; 23:14-16.) He was primarily expected to design and implement a sales strategy and work with his sales team to grow sales within his territory. (Ohnegan Cert., Ex. A, 24:2-5; 24:22-25:10.) Plaintiff was responsible for providing periodic reports to upper management related to sales bookings and forecasts. (Ohnegan Cert., Ex A, 27:24-28:3.)

Plaintiff received a starting annual salary of $142,000 and was eligible to participate in a bonus program. (Ohnegan Cert., Ex. A, 13:25-14:8.) He participated in the Senior Sales Manager Incentive Plan for fiscal year 2011, which ran from July 1, 2010 to June 30, 2011. (Ohnegan Cert., Ex. A, 32:22- 33:1, 39:11-17; Ex. B, D00028.) The Senior Sales Manager Incentive Plan served as the compensation plan for: John Atkinson, the Director of Defense Programs; John Kuntz, the Manager of Defense Sales;

Stephen McHugh, the Vice President of Defense Programs; Plaintiff, the Director of North American Sales; and Carol Shaltis, the Manager of Metal Detector Business Development. (Ohnegan Cert., Ex. B, D00028; Ex. A, 55:7-57:12.) Atkinson, Kuntz and McHugh, and Shaltis are Caucasian. (Ohnegan Cert., Ex. A, 57:16-58:11.) Plaintiff is African-American. (Ohnegan Cert., Ex. C, ¶2.)

The Senior Sales Manager Incentive Plan states that participants would receive a base salary in part to compensate them for the various administrative and other activities expected of sales managers. (Ohnegan Cert., Ex. B, D00028.) Plaintiff's Senior Sales Manager Incentive Plan states that Plaintiff would be eligible to receive an Annual Booking Target Bonus of up to twenty-five percent (25%) of his salary if he achieved his sales quota. (Ohnegan Cert., Ex. B, D00029, D00031.) The Senior Sales Manager Incentive Plan states that participants may be eligible to receive a bonus based on achieving certain Key Performance Indicators (KPIs) identified in the participant's annual review. (Ohnegan Cert., Ex. B, D00029.) The Senior Sales Manager Incentive Plan states that the award of a KPI bonus was in Rapiscan's sole discretion. (Ohnegan Cert., Ex. B, D00029.)

Plaintiff was expected to achieve $24 million in sales to receive the

Annual Bonus in fiscal year 2011. (Ohnegan Cert., Ex. B, D00029; Ex. A, 43:16-19.) The Senior Sales Manager Incentive Plan provides that Plaintiff could have received seventy-five percent (75%) of the Annual Bonus if he achieved at least ninety percent (90%) of his sales quota in fiscal year 2011. (Ohnegan Cert., Ex. B, D00029; Ex. A, 43:2-7.) The Senior Sales Manager Incentive Plan provides that Plaintiff could have received up to one hundred twenty-five percent (125%) of the Annual Bonus if he achieved at least one hundred thirty percent (130%) of his sales quota in fiscal year 2011. (Ohnegan Cert., Ex. B, D00029; Ex. A, 43:21-25.)

The Senior Sales Manager Incentive Plan does not provide for payment of any commissions for listed employees, including Plaintiff, and states that prior commission plans were no longer part of the compensation package for Senior Sales Managers. (Ohnegan Cert., Ex. B, D00029.)

Plaintiff prepared and presented the North America Commercial Sales and Strategy Overview for fiscal year 2011 to Rapiscan and its parent corporation's upper management at a conference in July 2010. (Ohnegan Cert., Ex. D; Ex. A, 81:6-23.) Plaintiff's presentation set forth the goals and initiatives of the North American Commercial sales team for fiscal year 2011. (Ohnegan Cert., Ex. A, 77:18-23.) Plaintiff forecasted that his department would book sales of $24.3 million in fiscal year 2011. (Ohnegan

Cert., Ex. D, Plaintiff32; Ex. A, 71:25-72:1.) The North America Commercial sales team booked sales of $22.4 million in fiscal year 2010 and $18 million in fiscal year 2009. (Ohnegan Cert., Ex. D; Ex. A, 70:17- 71:7; 71:15-72:2.)

Plaintiff presented his "Micro Territory Strategy" at the July 2010 conference, which was to be implemented in fiscal year 2011. (Ohnegan Cert., Ex. D.) The Micro Territory initiative involved the hiring of ten new sales managers throughout North America and the assignment of each to a geographical territory. (Ohnegan Cert., Ex. A, 77:24-79:2.) The purpose of the Micro Territory initiative was to meet with more prospective customers and consummate more sales. (Ohnegan Cert., Ex. A, 78:15-17.)

Although he was employed for only part of fiscal year 2010, Plaintiff received a positive performance review from Peter Kant in September 2010. (Ohnegan Cert., Ex. E.) Plaintiff received an overall rating of "Commendable" in his September 2010 review. (Ohnegan Cert., Ex. E, D00003.) The September 2010 performance review highlighted the North America sales team's achievement of its $21 million bookings quota and complimented other areas of Plaintiff's performance. (Ohnegan Cert., Ex. E, D00002-D00003.) The September 2010 performance review noted several areas where Plaintiff needed to improve his performance. (Ohnegan Cert., Ex. E, D00002.) The September 2010 performance review noted that

Plaintiff needed to facilitate the success of his sales team and to not attempt to control all aspects of a business opportunity because such actions stifled his productivity and the Company's growth. (Ohnegan Cert., Ex. E, D00002.) The September 2010 performance review noted that Plaintiff tended to overreact to the actions of his employees and that Plaintiff tried to control employee communications with senior management, which disrupted the work communication process. (Ohnegan Cert., Ex. E, D00002.) The September 2010 performance review stated that Plaintiff needed to be more timely in submitting his monthly reports, forecast evaluations and quarterly bookings guidance. (Ohnegan Cert., Ex. E, D00002.)

Plaintiff submitted comments in response to the performance review. (Ohnegan Cert., Ex. F, D00234.) Plaintiff commented in the September 2010 performance review that he believed the review was an accurate depiction of his activities and the areas where his performance could improve. (Ohnegan Cert., Ex. F, D00234.) Plaintiff commented in the September 2010 performance review that he observed the same performance shortcomings that Peter Kant identified in the review. (Ohnegan Cert., Ex. F, D00234.)

The September 2010 performance review contained a section setting

forth Plaintiff's job performance and professional development goals for fiscal year 2011. (Ohnegan Cert., Ex. F, D00235.) Among Plaintiff's objectives for fiscal year 2011 was the implementation of the Micro-Territory Sales Strategy, including filling ten sales positions, delivering $24 million in sales, and meeting his reporting obligations. (Ohnegan Cert., Ex. F, D00235.)

On March 29, 2011, Peter Kant received a complaint from Mike Gray, a Rapiscan employee, that Plaintiff had been verbally abusive and disrespectful towards him during a conversation. (Ohnegan Cert., Ex. G, D00187; Ex. A, 135:24-136:10.) During the same week he received Mike Gray's complaint, Peter Kant learned of an email exchange between Plaintiff and Sarah Benoit, another Rapiscan employee, that Peter Kant deemed inappropriate and unprofessional. (Ohnegan Cert., Ex. G, D00187.) A short time later, Peter Kant received a complaint from John Conlon, another Rapiscan employee, that Plaintiff had been "hot-headed" and "volatile" with members of Rapiscan's service team. (Ohnegan Cert., Ex. G, D00187.)

Peter Kant met with Plaintiff to discuss the incidents with his co-workers. (Ohnegan Cert., Ex. G, D00187; Ex. A, 145:25-147:3.) During the meeting, Peter Kant informed Plaintiff of the complaints made about him

and advised Plaintiff that his conduct was unprofessional, unacceptable and not productive. (Ohnegan Cert., Ex. G, D00187.) Plaintiff assured Peter Kant that he would not engage in further acts of inappropriate conduct. (Ohnegan Cert., Ex. G, D00187; Ex. A, 155:1-9.)

A short time after meeting with Plaintiff, Peter Kant received calls from Plaintiff and John Conlon each accusing the other of causing a heated argument between them. (Ohnegan Cert., Ex. G, D00187; Ex. A, 155:13-156:22.) Peter Kant had a second meeting with Plaintiff during the week of the incident with John Conlon. (Ohnegan Cert., Ex. G, Ex. A, 157:7-158:13.) Peter Kant counseled Plaintiff for a second time about the inappropriateness of his actions, the need to control his outbursts and improve his level of professionalism. (Ohnegan Cert., Ex. G, D00187-D00188; Ex. A, 158:24-159:7.) Plaintiff promised for a second time that there would be no further incidents of inappropriate conduct. (Ohnegan Cert., Ex. G, D00188; Ex. A, 159:18-160:6.)

On April 17, 2011, approximately one week after meeting with Plaintiff, Peter Kant was contacted by Navneet Grover Mosey, one of Plaintiff's sales managers. (Ohnegan Cert., Ex. G, D00188; Ex. A, 160:8-16.) Navneet Grover Mosey complained that Plaintiff was intimidating, verbally abusive and did not allow her the freedom to perform her job successfully.

(Ohnegan Cert., Ex. G, D00188; Ex. A, 160:17-24.) Navneet Grover Mosey further complained that Plaintiff required her to follow "undue processes and procedures" which limited her ability to communicate with customers and other Rapiscan employees. (Ohnegan Cert., Ex. G, D00188; Ex. A, 161:1-14.) Navneet Grover Mosey made a complaint to Rapiscan's Human Resources department about Plaintiff which promptly conducted an investigation. (Ohnegan Cert., Ex. G, D00188; Ex. A, 161:18-163:1.)

In the course of Human Resources' investigation, a number of employees reported feeling bullied and intimidated by Plaintiff, and one employee expressed a fear of taking Plaintiff's telephone calls. (Ohnegan Cert., Ex. G, D00188; Ex. A, 164:10-20.) As a result of Human Resources' findings, Plaintiff was placed on a performance improvement plan. (Ohnegan Cert., Ex. G.) The performance improvement plan outlined the several complaints made against Plaintiff and advised Plaintiff that significant and immediate improvement was necessary for continued employment at Rapiscan. (Ohnegan Cert., Ex. G.) Peter Kant sent the performance improvement plan to Plaintiff on May 24, 2011. (Ohnegan Cert., Ex. G, D00186.)

The North American Commercial sales team booked sales of approximately $14.4 million in fiscal year 2011. (Ohnegan Cert., Ex. A,

176:17-20; Ex. H.) The fiscal year sales booking of $14.4 million was less than sixty percent (60%) of the forecasted sales which Plaintiff was expected to deliver. (Ohnegan Cert., Ex. D; Ex. H, Plaintiff21.)

In October 2011, Peter Kant completed Plaintiff's performance review for fiscal year 2011. (Ohnegan Cert., Ex. I.) Plaintiff received ratings of either "Development Opportunity" or "Unsatisfactory" in six of the twelve core competencies categories. (Ohnegan Cert., Ex. I, D00007.) Plaintiff received a rating of either "Development Opportunity" or "Unsatisfactory" in all six core management competencies categories. (Ohnegan Cert., Ex. I, D00007.) The performance review highlighted the delayed hiring of the territory sales managers and the North America Commercial sales team's poor sales results among the disappointing aspects of Plaintiff's performance. (Ohnegan Cert., Ex. I, D00008.) The performance review also noted Plaintiff's issues organizing information and the efforts of his sales team. (Ohnegan Cert., Ex. I, D00008.) The performance review noted that Plaintiff continued to have problems sharing information with his team and others at Rapiscan. (Ohnegan Cert., Ex. I, D00008.) The performance review noted that Plaintiff was slow to make decisions and habitually late providing monthly reports, bookings forecasts and proposal drafts and that Plaintiff's tardiness in this regard negatively impacted Peter Kant's ability

to manage the business. (Ohnegan Cert., Ex. I, D00008.) The performance review noted Plaintiff's conflicts with his co-workers and expressed a belief that Plaintiff's management style was ineffective and limited his growth as a manager and leader. (Ohnegan Cert., Ex. I, D00008.)

Plaintiff and Peter Kant met to discuss the review and a copy of the review was provided to Plaintiff. (Ohnegan Cert., Ex. A, 180:15-181:20.) Plaintiff refused to sign the review and provided no comments. (Ohnegan Cert., Ex. I, D00009.)

By January 2012, four of the ten territory sales manager positions on the North America Commercial sales team which were expected to be filled by the end of October 2010 still remained open. (Ohnegan Cert., Ex. A, 210:20-23; Ex. F, D00235.) Plaintiff failed to provide the January 2012 sales forecast by the deadline. (Ohnegan Cert., Ex. J, D00151-D00152; Ex. A, 211:6-24.) On January 26, 2012, Peter Kant advised Plaintiff that he needed the sales forecast to prepare his build schedule to be sent to Rapiscan's manufacturing component. (Ohnegan Cert., Ex. J, D00151; Ex. A, 212:11-213:9.) Plaintiff advised Peter Kant he would provide the forecast that evening. (Ohnegan Cert., Ex. J, D00151.) Plaintiff did not provide the sales forecast to Peter Kant until four days later. (Ohnegan Cert., Ex. K; Ex. A, 213:17-214:9.)

On January 27, 2012, Peter Kant sent Plaintiff a letter for review and editing. (Ohnegan Cert., Ex. L; Ex. A, 214:24-216:1.) On January 31, 2012, Peter Kant sent a follow up email to Plaintiff requesting feedback on his letter to UPS. (Ohnegan Cert., Ex. M; Ex. A, 216:11-217:2.) By February 3, 2012, Plaintiff still had not responded to Peter Kant's January 27 email and request. (Ohnegan Cert., Ex. N.) On February 3, 2012, Peter Kant sent an email to Plaintiff stating that it was "ridiculous" that Plaintiff had failed to provide comments to his letter and that if Kant had time to write it, Plaintiff had time to review it. (Ohnegan Cert., Ex. N.)

Plaintiff began complaining to Peter Kant that Rapiscan's service pricing was the highest in the industry and that its competitors' products performed better. (Ohnegan Cert., Ex. A, 231:2-232:12.) On February 9, 2012, Plaintiff sent an email to operations personnel demanding better installation and service pricing. (Ohnegan Cert., Ex. O, D00136.) On February 9, 2012, Peter Kant sent Plaintiff an email admonishing him for sending the email without his approval and for failing to put together a strategy for improving installation and service pricing as he had been instructed. (Ohnegan Cert., Ex. O, D00136.)

In February 2012, Plaintiff failed to meet the deadline for the submission of his sales forecast for the second consecutive month.

(Ohnegan Cert., Ex. P, D00111; Ex. Q, 6:13-7:21.) As a result of Plaintiff's failure to provide the sales forecast, the business was forced to use two month old, outdated data to build its forecast. (Ohnegan Cert., Ex. P, D00111.)

Peter Kant advised Plaintiff that his repeated failures to meet the sales forecast deadline were unacceptable. (Ohnegan Cert., Ex. P, D00111.) Plaintiff acknowledged his failure, but then engaged in an email debate with Sarah Benoit arguing about the procedures for submitting the reports. (Ohnegan Cert., Ex. P, D00109-D00110.) On March 15, 2012, Peter Kant intervened in an email argument between Plaintiff and Sarah Benoit regarding logistics pricing and instructed them to resolve their issues by telephone. (Ohnegan Cert., Ex. R.) Plaintiff had been previously counseled by Peter Kant about arguing with co- workers over email. (Ohnegan Cert., Ex. Q, 30:24-31:5; 32:2-5.)

On March 19, 2012, Plaintiff was sent his 2012 Senior Sales Manager Incentive Plan. (Ohnegan Cert., Ex. S; Ex. Q, 34:17-35:4.) After receiving the 2012 Senior Sales Manager Incentive Plan, Plaintiff advised Peter Kant that he disagreed with the plan and refused to sign it. (Ohnegan Cert., Ex, Q, 35:2-36:4.) Plaintiff complained to Peter Kant about being paid commissions and bonuses for work performed in the previous fiscal years.

(Ohnegan Cert., Ex. Q, 36:1-37:14.)

On March 21, 2012, Plaintiff complained to Peter Kant about Rapiscan's "inability to provide realistic logistics services/freight rates" and stated his belief that the company was "loosing [sic] business, upsetting clients and frustrating customers." (Ohnegan Cert., Ex. T, D00095.) On March 21, 2012, Plaintiff engaged in an email argument with Sarah Benoit regarding price quoting and the assignment of a federal account. (Ohnegan Cert., Ex. U, D00086-D00087.) Peter Kant advised Plaintiff that he should direct his complaints about the handling of the federal account to him. (Ohnegan Cert., Ex. T, D00086.)

On March 28, 2012, Plaintiff sent Peter Kant an email setting forth numerous issues which he believed were contributing to his team's poor sales performance. (Ohnegan Cert., Ex. V; Ex. Q, 61:21-62:12; 76:12-17.) Plaintiff complained that: manufacturing was not building equipment quickly enough to meet customer expectations; the company's products were unreliable and of poor quality; the quoting process was unorganized and untimely; Rapiscan's prices were higher than their competitor's prices; the process for obtaining approval for discount pricing took too long; the Company lacked a customer relationship management database; the Company was unwilling to hire a logistics company to do shipping or

consider leasing programs; the Company failed to follow through on a walk through metal detector project for the NBA; the Company ignored the Canadian market by failing to customize the machines for use in Canada; the Company moved certain federal government targets outside of his team's territory; and his distributor was a poor performer. (Ohnegan Cert., Ex. Q, 62:13-76:11.)

On March 29, 2012, Plaintiff sent an email to Peter Kant following up on a request for a sales credit on a sale that was never consummated and requesting a quota adjustment to lower his sales target. (Ohnegan Cert., Ex. W, D00077-D00078; Ex. Q, 77:22- 79:15.) Plaintiff also complained that his sales quota should be reduced because his team was no longer permitted to sell to the Federal Reserve Bank, the Veteran's Administration or the Federal Bureau of Prisons. (Ohnegan Cert., Ex. W, D00077-D00078; Ex. Q, 83:1-4.)

On March 30, 2012, Peter Kant met with Plaintiff to advise him that his employment was being terminated. (Ohnegan Cert., Ex. Q, 90:17-91:16.)

Discussion

Local Civil Rule 56.1 provides:

> The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed,

> stating each material fact in dispute and citing to the other affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

Thus, the local rule requires that the opponent of a summary judgment motion must provide: (a) a clear indication of "agreement or disagreement" as to each statement of undisputed fact listed by the movant, and (b) if "disagreement," then a statement of each material fact in dispute with citation to affidavits and/or other documentation. Plaintiff's opposition does not include a responsive statement either agreeing or disagreeing with Rapiscan's assertions of undisputed material fact. Thus, all of the fact set forth in Rapiscan's Statement of Undisputed Material Facts must be deemed undisputed for purposes of this motion. See Muhammad v. Sills, Cummis & Gross, 2014 WL 5812270, *1 (D.N.J. November 10, 2014); Kohn v. Aetna, 2013 WL 1903346, *2 (D.N.J. May 6, 2013).

Plaintiff's opposition amounts to six paragraphs of facts alleged by his attorney with no citations to any evidential materials. Plaintiff failed to submit an affidavit or any other admissible evidence in support of his factual assertions. "Conclusory statements, general denials, and factual allegations not based on personal knowledge are insufficient to avoid summary judgment." Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972).

## Conclusion

In this case, there are no genuine issues of material fact in dispute and Plaintiff presents no evidence from which a reasonable fact-finder could conclude that Plaintiff was treated differently and/or terminated based on his race. As a result, Rapiscan is entitled to summary judgment. An Order will be entered.


Dated: April 10, 2017                     /s/ Joseph H. Rodriguez
                                                    JOSEPH H. RODRIGUEZ
                                                        U.S.D.J.